UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMENT, GENERAL COMMITTEE OF ADJUSTMENT, UNION PACIFIC WESTERN LINES AND PACIFIC HARBOR LINES,<br><br>Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD CO.,<br><br>Defendant. | Case No. 1:16-cv-07233<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

This dispute concerns the dismissal of R.J. Griff ("Griff"), a former employee with Defendant Union Pacific Railroad Company ("Defendant" or "Union Pacific"). Griff, through his representatives at Plaintiff Brotherhood of Locomotive Engineers and Trainmen, General Committee of Adjustment, Union Pacific Western Lines and Pacific Harbor Lines ("Plaintiff" or "BLET"), contended that his dismissal from Union Pacific was procedurally improper and submitted this dispute to the First Division of the National Railroad Adjustment Board (the "Board" or "NRAB"). The Board ultimately denied Plaintiff's claim and upheld his termination.

In response to the Board's decision, Plaintiff initiated this lawsuit, bringing claims pursuant to the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA"), and the Due Process Clause of the Fifth Amendment to the United States Constitution. [1] at 5-7. The parties have filed cross-motions for summary judgment, and, for the

1

reasons explained below, Defendant's motion [20] is granted while Plaintiff's motion [14] is denied.

I.  **Background**[1]

From 1984 through 2005, Griff was a "craft" employee at Union Pacific represented by BLET, eventually becoming a Locomotive Engineer. [23] at 2. When he was a Locomotive Engineer, the terms and conditions of Griff's employment were governed by the parties' collective bargaining agreements. *Id.* at 6. Two particular provisions of the collective bargaining agreements are salient here: the "Discipline Rule" and "Article 9" (collectively, the "CBA Provisions"). *Id.* at 6-7.

A. **The CBA Provisions**

Under the Discipline Rule, "Locomotive Engineers will not be disciplined without first being given a fair and impartial investigation." [12-1] at 135. Practically, this provision guarantees that a Locomotive Engineer: (1) will be apprised "of the specific charges against him or her"; (2) is entitled to "representation by a [BLET] representative" in a "recorded and transcribed" investigatory hearing; (3) will be "afforded the opportunity to examine or cross

---

[1] The facts are taken from the Arbitration Record [12-1] and the parties' Local Rule 56.1 statements. [16] refers to Plaintiff's statement of facts. [23] contains Defendant's responses to Plaintiff's statement of facts and Defendant's statement of additional material facts. [25] contains Plaintiff's responses to Defendant's statement of additional material facts. [23] is supported by a declaration from David Foley [23-1], a Labor Relations official at Union Pacific. Plaintiff suggests that this declaration represents an improper attempt to introduce new evidence and should be stricken. [24] at 4. Defendant contends that Foley's declaration properly serves to "authenticate documents in the arbitral record and to summarize the arguments made to the NRAB by the parties." [26] at 1. The Court declines to strike Foley's affidavit. While the Court reviews the Arbitration Record and the Board's decision independently, Foley's declaration contextualizes those same materials, and is proper under Federal Rule of Civil Procedure 56(c)(4).

2

examine all witnesses" who testify at the investigatory hearing; and (4) will receive Union Pacific's written decision on the merits within ten days of the investigatory hearing. [25] at 2-3 (citing [12-1] at 135-37). If the Locomotive Engineer disagrees with Union Pacific's disciplinary decision, BLET may challenge it through the CBA's grievance-and-appeal process and the RLA, culminating in binding arbitration before the Board. *Id.* at 3.

Article 9, meanwhile, provides that any employee (including any Locomotive Engineer) promoted to a supervisory position after July 1995 can either: (1) continue to "accumulate seniority [in their original craft position] so long as he/she pays a fee [to BLET] no greater than the applicable current membership dues"; or (2) decline to pay a fee to BLET, in which case "he/she shall retain but cease to accumulate seniority" in their original craft position. *Id.* at 4; *see also* [12-1] at 132.

### B. Griff's Promotion and Termination

In December 2005, Griff was promoted by Union Pacific to "Manager of Operating Practices." [16] at 2. In September 2011, Union Pacific promoted Griff again, this time to "Manager of Road Operations." *Id.* The parties agree that both of these positions are "supervisory" and "at-will," such that they "are not covered by any collective bargaining agreement between the parties." [23] at 2. Griff nevertheless elected, pursuant to Article 9, to continue to pay BLET dues, and he accordingly continued to accrue seniority as a Locomotive Engineer while working in a supervisory capacity. *Id.* at 3.

In an announcement dated August 12, 2012, Union Pacific's former Chief Operating Officer Lance Fritz advised supervisory employees (including Griff) that any "non-agreement employee who knowingly provides false information and/or who willingly fabricates reporting will be terminated from the Company—employees who have seniority will not be allowed to return to their seniority." [12-1] at 2-3; [23-1] at 5.

On February 27, 2013, Union Pacific terminated Griff's employment "for falsifying performance evaluations and check rides of employees." [12-1] at 3, 106. On April 1, 2013, Plaintiff appealed Griff's termination by way of a letter to Union Pacific's Assistant Director of Labor Relations. *Id.* at 112-15. BLET challenged Union Pacific's termination of Griff on two separate grounds. First, Plaintiff argued that, as a dues-paying BLET member, he could not be fired absent the "fair and impartial" investigatory hearing described in the Discipline Rule. *Id.* Plaintiff further contended that Griff had the right to exercise his seniority privileges as a Locomotive Engineer under Article 9. *Id.*

Union Pacific denied Plaintiff's appeal eleven days later. *Id.* at 117. Defendant explained that Griff "was not part of a collective bargaining unit or covered by a collective bargaining agreement at the time of his discharge." *Id.* Accordingly, Union Pacific "had no obligation to hold an investigative hearing or permit Mr. Griff to exercise his seniority to an agreement position." *Id.*

In September 2013, Plaintiff filed its Notice of Intent to appeal Union Pacific's decision to the Board. *Id.* at 35.

4

### C. The Board's Decision

In its submission to the Board, Plaintiff insisted that, under "the plain contractual language" of the CBA Provisions, he was entitled to both a full investigatory hearing and reinstatement as a Locomotive Engineer. *See generally id.* at 89-104 ("So long as an employee holds seniority under a collectively bargained agreement, he cannot be 'at-will.' . . . The Carrier breached the contract by failing to provide the Claimant and the Organization notice and an investigation hearing."). Union Pacific predictably disagreed, arguing that Griff's employment was not "governed by the provisions of the Engineer's collective bargaining agreement," such that he "was not due a hearing nor does he have the right to exercise his seniority back to the craft." *Id.* at 9.

On January 28, 2016, the Board denied BLET's claim and upheld Griff's termination. *See generally id.* at 1-6. In reaching its decision, the Board first quoted directly from Article 9. *Id.* at 2. The Board then explained that its interpretation of Article 9 was informed by its own arbitral precedent, as this was "not a case of first impression" for "either the Board or these Parties." *Id.* at 3. In fact, "several" cases previously decided by the Board held that "covered employees who are promoted to management positions, but continue to accrue craft seniority, may be terminated while performing their management duties for engaging in wrongdoing without resort to their contractual due process protections." *Id.*

The Board also noted that its earlier decisions were animated by cogent policy concerns also present here:

5

> If the Carrier has terminated a non-covered employee for cause, and did this unilaterally, this employee, even if he possesses seniority in a contractually covered craft, may not then seek to invoke the contractual protection that inheres to members of his craft. This is so because when the Carrier permanently terminated the non-bargaining unit employee from service for cause, the Carrier severed the employment relationship permanently, albeit unilaterally, and this employee, although he retained seniority in a covered craft, cannot invoke the contractual protection of that craft, because at this time he was no longer an employee. The employee relationship having been irrevocably ended for cause, there is no longer any valid basis upon which the employee's seniority can operate. The Board is led to this conclusion for otherwise an employer could not discharge a non-covered employee for cause no matter how egregious and reprehensible his offense, because this employee continued to hold seniority in a covered craft.

*Id.* at 4 (internal quotation omitted).

The Board concluded its analysis by returning to the language of the CBA Provisions. *Id.* at 5-6. The Board flatly rejected BLET's argument that the Board's earlier decisions were distinguishable in light of Article 9's particular language. *Id.* at 5 (Article 9 "makes absolutely no reference to a promoted employee being able to exercise seniority in the face of termination from a management position for cause."). Instead, the Board held Article 9 only gave Griff "the right *at any time prior to his termination* to return to his covered position in the event he was unable to satisfactorily perform his management duties, or was simply dissatisfied with the position." *Id.* (emphasis in original).

## II. Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.,* 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland School Dist.,* 743 F.3d 524, 528 (7th Cir. 2014).

## III. Analysis

Plaintiff has two claims: Count I, under the RLA, and Count II, pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution. [1] at 5-7. As discussed below, neither claim survives summary judgment.

### A. Count I - RLA

Under the RLA, "a railroad employee alleging a violation of a collective bargaining agreement must submit such a dispute" to the Board for resolution. *Union Pacific R.R. Co. v. Sheehan*, 439 U.S. 89, 89 (1978). A railroad employee may then petition a federal district court for review of the Board's decision. *See* 45 U.S.C. § 153(q). During the district court's review, the findings and order of the

Board "shall be conclusive on the parties, except that the order" of the Board "may be set aside, in whole or in part, or remanded": (1) for failure of the Board to comply with the requirements of the RLA; (2) for failure of the order to conform, or confine itself, to matters within the scope of the Board's jurisdiction; or (3) for fraud or corruption by a member of the Board. *Id.* The Supreme Court has "time and again emphasized that this statutory language means just what it says," such that "only upon one or more of these bases may a court set aside an order of the Adjustment Board." *Sheehan*, 439 U.S. at 93.

Judicial review of the Board's decision under the RLA is "among the narrowest known to law." *Id.* at 91. As the Seventh Circuit has said "too many times to want to repeat again, the question for decision by a federal court asked to set aside an arbitration award—whether the award is made under the Railway Labor Act, the Taft-Hartley Act, or the United States Arbitration Act—is not" whether the Board "erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. If they did, their interpretation is conclusive." *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1194-95 (7th Cir. 1987) (internal citation omitted); *see also Dexter Axle Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d 762, 768 (7th Cir. 2005) ("any reasonable doubt" about whether an arbitral award "draws its essence" from the governing collective bargaining agreement should be resolved in favor of award-enforcement); *Lyons v. Norfolk & W. Ry. Co.*, 163 F.3d 466, 470 (7th

8

Cir. 1999) ("Because we find that the [Board] interpreted the contract, its interpretation is conclusive.").

### 1. The Board Conclusively Interpreted The Relevant CBA Provisions

Griff contends he was entitled to supervisory privileges under Article 9 and an investigatory hearing under the Discipline Rule; Defendant disagrees. There is no suggestion in the record that Griff would be entitled to either supervisory privileges or an investigatory hearing *absent* the CBA Provisions. In short, the CBA Provisions form the crux of this case, and the Board's final decision understandably turned upon its interpretation of this contractual language.

The Board extensively quoted from Article 9, and discussed multiple arbitral precedents construing language similar to the CBA Provisions. [12-1] at 1-5. The Board held that, under this same precedent, management employees are "not entitled to exercise their seniority back to their Agreement positions or to an investigation prior to being terminated." *Id.* at 3. The Board specifically rejected Plaintiff's reading of Article 9, as Plaintiff had "not pointed to any language contained in Article 9 that distinguishes it from the other seniority accumulation provisions relied on by those employees in [earlier decisions] who similarly (and unsuccessfully) attempted to protect their employment when terminated from their management positions." *Id.* at 5.

Ultimately, the Board's decision reflects that it "interpreted the contract" and that "interpretation is conclusive." *Lyons*, 163 F.3d at 470 (internal quotation omitted); *see also Dexter Axle Co.*, 418 F.3d at 768 ("any reasonable doubt" about

9

whether an arbitral award flows from CBA should be resolved in favor of award-enforcement).

### 2. The Board Acted Within Its Jurisdiction

Plaintiff first attempts to evade the foregoing result by suggesting that the Board "purported to address a dispute over whether an 'at-will' supervisory employee is entitled to any process before termination—a dispute over which it has no jurisdiction." [15] at 5. This argument is belied by the record and governing case law. *See Tice v. Am. Airlines, Inc.*, 288 F.3d 313, 314 (7th Cir. 2002) ("Arbitral boards established pursuant to the Railway Labor Act have exclusive jurisdiction to resolve disputes over the application of collective bargaining agreements in the railroad and airline industries."); *see also Bhd. of Maint. of Way Employees v. Union Pac. R. Co.*, 358 F.3d 453, 456 (7th Cir. 2004) ("The RLA grants exclusive jurisdiction to resolve 'minor' disputes regarding railway labor agreements to arbitrators on the National Railroad Adjustment Board or adjustment boards established by an employer and a union.").

As discussed *supra*, the parties' dispute turned on Union Pacific's decision to deny Plaintiff both the investigatory hearing described in the Discipline Rule and the seniority privileges reflected in Article 9. These privileges were conferred by the CBA Provisions, and the Board *explicitly* interpreted this same contractual language to determine if these privileges were actually implicated by Griff's termination. *See* [12-1] at 5. Plaintiff's suggestion that the Board did not "engage with the collective bargaining agreements" is specious. [15] at 6.

Plaintiff then claims that the Board exceeded its jurisdiction by deciding two issues "outside the arbitral record": (1) "that Griff was dismissed 'for cause'"; and (2) "that Griff was on notice that he forfeited his rights under the contract when he accepted a promotion to a supervisory position." *Id.*

This argument misreads the Board's decision. The Board explicitly noted that "having 'cause' to terminate" an employee in this context "does not mean that the terminated management employee is entitled to a formal investigation under the craft Agreement." [12-1] at 6. Instead, "cause" simply means "that the Carrier cannot fire a management employee with Article 9 rights without articulating a good faith basis as to why it has cause to do so. *The Carrier has done so in this case.*" *Id.* (emphasis added). The Board did not decide that Griff was terminated for cause; instead, the Board decided that Union Pacific had articulated a good faith basis for its termination decision, which was all that was required by the CBA Provisions under controlling precedent.

Plaintiff's "notice" argument is similarly unavailing. Although the Board referenced Mr. Fritz's letter, its analysis of the parties' rights and obligations turned on the language of the CBA Provisions and governing precedent. *Id.* at 1-4. This analysis is entirely consistent with the letter and spirit of the RLA's jurisdictional limits. *See Tice*, 288 F.3d at 314 ("Arbitral boards established pursuant to the Railway Labor Act have exclusive jurisdiction to resolve disputes over the application of collective bargaining agreements in the railroad and airline industries.")

11

### 3. The Board Complied With Other RLA Rules

Plaintiff then argues that, even if the Board's decision was within its jurisdictional purview, it should nevertheless be vacated for failure to comply with various other RLA requirements. Each of these arguments is rejected in turn.

#### (a) Representative Selection

Plaintiff first invokes 45 U.S.C. § 152, which provides that representatives under the RLA "shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other." Plaintiff suggests that the Board's ruling violated this principle, insofar as it "deprive[d] Griff of the advantages of BLET membership." [15] at 7.

This argument is a non-starter. There is no suggestion in the record that Defendant "interfered, influenced, or coerced" Plaintiff in the selection of his BLET representatives. Instead, the undisputed record demonstrates that the Board, interpreting the CBA Provisions in light of its precedent, explained to Griff's designated BLET representatives that he had "the right *at any time prior to his termination* to return to his covered position in the event he was unable to satisfactorily perform his management duties, or was simply dissatisfied with the position." [12-1] at 5 (emphasis in original). § 152 does not grant this Court the authority to second-guess the Board's contractual interpretation, and Plaintiff's reading to the contrary is rejected.

### (b) The "Usual Manner"

Plaintiff then suggests that the Board's decision violated 45 U.S.C. § 153, which provides that disputes between employees and carriers "shall be handled in the usual manner . . . but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board." Plaintiff argues that Griff's dispute was not handled in the "usual manner," insofar as Union Pacific did not conduct the investigatory hearing contemplated by the Discipline Rule. [15] at 8.

This argument must be rejected. Before a grievance is submitted to the Board, "the dispute is between private parties" and the "rights available to an employee, therefore, are governed by the CBA." *Kulavic v. Chicago & Ill. Midland Ry. Co.*, 1 F.3d 507, 515 (7th Cir. 1993); *see also Ryan v. Union Pac. R. Co.*, 286 F.3d 456, 459 (7th Cir. 2002) (The "usual manner provision allows the railroad and the union to prescribe *in the collective bargaining agreement* the manner in which grievance proceedings shall be conducted on the property.") (emphasis in original). Pursuant to the Board's definitive interpretation of the CBA Provisions, no investigatory hearing was required, and Plaintiff's attempt to re-litigate this question through § 153 fails.[2]

---

[2] Plaintiff is essentially making a circular argument that Griff was entitled to an investigatory hearing under the Discipline Rule prior to the arbitration designed to determine whether such an investigatory hearing was due in the first instance.

### (c) A "Full Statement"

Finally, Plaintiff insists that the Board's decision was improper, because the referral to the Board was not accompanied by "a full statement of the facts and all supporting data bearing upon the disputes." [15] at 8-9; *see also* 45 U.S.C. § 153(i) ("disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes"); 29 C.F.R. § 301.5 (both parties submissions to the Board must "set forth all relevant, argumentative facts, including all documentary evidence submitted in exhibit form, quoting the agreement or rules involved, if any; and all data submitted in support of [the submitting party's] position must affirmatively show the same to have been presented to the [opposing party] and made a part of the particular question in dispute").

This argument fails because the undisputed record reflects that the Board was in possession of all the material needed to resolve this dispute. Both parties' submissions focused on the meaning of the CBA Provisions. *Compare* [12-1] at 9 ("In this case Claimant was not part of a collective bargaining unit or covered by a collective bargaining agreement . . . .") *with id.* at 94 ("Under the plain contractual language, the Claimant as a bargaining unit member acquired a vested right . . . .") *and id.* at 97 ("So long as an employee holds seniority under a collectively bargained agreement, he cannot be 'at-will.'") *and id.* at 99 ("Allowing the Carrier to treat engineers who hold seniority as 'at-will' has absurd consequences that would

undermine the contract.") *and id.* at 102 ("The Carrier breached the contract by failing to provide the Claimant and the Organization notice and an investigation hearing."). The Board was in possession of these same CBA Provisions, *id.* at 132, 135-138, and the Board's decision turned on its interpretation of this contractual language. *Id.* at 1-6. Plaintiff does not identify any facts or data not submitted to the Board that would have altered the Board's analysis of the controlling CBA Provisions, and its argument pursuant to § 153(i) is rejected.

### B. Count II – Due Process

The Seventh Circuit has previously held that "decisions of the National Railroad Adjustment Board may be set aside on due-process grounds, notwithstanding [*Sheehan*], and the omission of due process from the statutory grant of reviewing authority." *Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment, Cent. Region v. Union Pac. R. Co.*, 537 F.3d 789, 790 (7th Cir. 2008). The "requirements of due process are relaxed when the tribunal is an arbitral tribunal rather than a court." *Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment, Cent. Region v. Union Pac. R. Co.*, 522 F.3d 746, 751 (7th Cir. 2008), *aff'd on other grounds*, 558 U.S. 67 (2009) (internal quotation omitted). In this more relaxed posture, "due process is satisfied so long as the arbitrator provided a fundamentally fair hearing, one that meets the minimal requirements of fairness—adequate notice, a hearing on the evidence and an impartial decision by the arbitrator." *Id.* (internal quotation omitted).

On the due process question, Plaintiff presents conflicting arguments that initially insist that this "is not a case about what sort of procedures are sufficient under the due process clause" only to later claim that the Board "violated the Due Process clause because it held Griff to have forfeited" his seniority privileges "by taking a supervisory position, even though he had no notice that taking the position would have that effect." [15] at 9. In either event, Plaintiff does not dispute the Board's impartiality, so the Court must determine whether: (1) Plaintiff had "adequate notice" of the hearing; and (2) the Board's decision was "on the evidence."

### 1. Adequate Notice

Plaintiff claims he "had no notice" of the potential ramifications of "taking a supervisory position," *id.* at 9, but this formulation misstates the pertinent question. The issue here is whether Plaintiff had "adequate notice" *of the hearing itself*. *See Bhd. of Locomotive Engineers & Trainmen v. Union Pac. R. Co.*, No. 10-cv-6661, 2011 WL 5828129, at *6 (N.D. Ill. Nov. 18, 2011) ("Moreover, under Section 3, First (j) of the RLA, *due process is fulfilled if a party has reasonable notice of the hearing* and the opportunity to be present and heard.") (emphasis added). Plaintiff clearly had notice of the hearing before the Board. *See supra* at 2-4. In fact, Plaintiff, not Defendant, referred this matter to the Board, and Plaintiff was given a full opportunity to submit his arguments to the Board. *Id.* Any suggestion to the contrary is belied by the record.

## 2. "On The Evidence"

Plaintiff's argument that the Board's decision was not made "on the evidence" is similarly unpersuasive. Plaintiff's entire argument on this point concerns the putative wrongdoing that precipitated Griff's termination. *See* [24] at 7 ("without an investigatory hearing, BLET was prohibited from presenting evidence to the NRAB regarding the lack of cause for Griff's termination," and "because UP never presented BLET with any evidence of Griff's alleged wrongdoing, BLET had no chance to refute or respond to such accusations").

As explained previously, however, the basis for Griff's termination was not the issue before the Board. The Board was tasked with determining whether, under the CBA Provisions, Griff was due either an investigatory hearing or seniority privileges. *See supra* at 2-4. The Board determined that, pursuant to the CBA Provisions and controlling precedent, Griff was entitled to neither. *Id.* In coming to that determination, the Board noted that although Union Pacific could not "fire a management employee [like Griff] with Article 9 rights without articulating a good faith basis as to why it has cause to do so," Union Pacific had made the necessary articulation "in this case." [12-1] at 6. Evidence concerning Union Pacific's underlying termination decision was simply not required under the Board's definitive reading of the CBA Provisions, and Plaintiff cannot avoid this result by raising the specter of due process.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [20] is granted and Plaintiff's motion [14] is denied. Civil case terminated.

Date: March 31, 2017                                    Entered:

_____
John Robert Blakey
United States District Judge